## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Antonio G. Sisson
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

De.D., M.S., A.D. *(Minor Children),*

and

D.D. *(Mother),*

*Appellant-Respondent,*

v.

Indiana Department of Child Serivces,

*Appellee-Petitioner,*

November 20, 2020

Court of Appeals Case No.
20A-JT-1044

Appeal from the Delaware Circuit Court

The Honorable Kimberly Dowling, Judge

The Honorable Amanda Yonally, Magistrate

Trial Court Cause Nos.
18C02-1908-JT-183
18C02-1908-JT-184
18C02-1908-JT-185

**Robb, Judge.**

# Case Summary and Issue

[1] D.D. ("Mother") appeals the termination of her parental rights to three of her minor children and presents the sole issue of whether the juvenile court's order terminating her parental rights was clearly erroneous. Concluding it was not, we affirm.

# Facts and Procedural History

[2] Mother has four biological children, three of whom are the subject of this appeal: A.D., born September 10, 2015; M.S.,[1] born January 17, 2014; and De.D.,[2] born September 1, 2011 (collectively, "Children"). Mother's youngest child, Av.D., was born during these proceedings and was later adjudicated a child in need of services ("CHINS") but was not included in this termination action. Children's fathers do not participate in this appeal.

[3] On April 20, 2017, the Indiana Department of Child Services ("DCS") received a report alleging that A.D. was at Muncie City Hall because police conducted a raid at the home of the relative with whom A.D. was staying. The relative and other adults in the home were arrested and Mother could not be located, leaving the child without a caregiver. DCS family case manager ("FCM")

---

[1] In portions of the record, this child's initials appear as "M.D." However, in the juvenile court's order terminating Mother's parental rights as to this child, the initials are "M.S." Therefore, we refer to this child as M.S. throughout this opinion.

[2] Mother and this child have the same initials. Therefore, to differentiate between the two, we refer to this child as "De.D." throughout our opinion.

Steve Oetting responded to the call, went to City Hall, and detained A.D. Hours later, FCM Oetting was able to reach Mother, who stated she was not in Muncie; they agreed to meet the next day. A.D. was removed and placed in relative care.

[4] On April 24, DCS filed a petition alleging A.D. was a CHINS. An initial/detention hearing was held the same day and A.D. remained in her existing placement. The next day, a children and family team meeting was held with Mother and Mother's grandparents during which Mother indicated "she was still actively using [illicit drugs] and . . . was effectively homeless[.]" Transcript of Evidence, Volume 2 at 45. At the time, Mother had been staying with friends or family. DCS did not believe A.D. was safe due to Mother's substance abuse and lack of appropriate housing.

[5] Four days later, on April 28, DCS received a report that Mother had been admitted to the hospital for a suicide attempt. Mother also admitted to using heroin and cocaine and being homeless. At this time, DCS learned that Mother had two other children. The same day, DCS detained De.D. and M.S. and placed them with R.S., an individual DCS believed to be the father of both children.[3] On May 2, DCS filed petitions alleging M.S. and De.D. were CHINS.

---

[3] DCS later learned R.S. was only M.S.'s biological father.

[6] The Children were subsequently adjudicated CHINS.[4] Following a hearing, the juvenile court issued dispositional decrees[5] ordering Mother to (among other things): maintain contact with the FCM; maintain suitable housing and income; refrain from consuming illegal substances; complete a parenting assessment and follow all recommendations, such as home-based counseling; complete a substance abuse assessment and successfully complete all treatment recommendations; submit to random drug screens; and attend visitation. *See* Exhibits, Volume 1 at 18-19, 153-54; *id.,* Vol. 2 at 60-62. DCS made appropriate referrals for Mother.

[7] From April 2017 to December 2018, Rachael Green of A Work in Progress supervised Mother's visitations with Children. Visits occurred twice each week for two- to three-hour sessions. Mother was cooperative and consistent with most visits; however, Green testified that Mother would "get off track and then get back on track." Tr., Vol. 2 at 91. In other words, Mother would be inconsistent for several weeks and then consistent for several months. Green was able to tell if Mother was using drugs again. If sober, Mother would have planned activities and engage with the Children. If not sober, Mother would lay on the couch and not interact with the Children. Ultimately, Green

---

[4] M.S. and De.D. were adjudicated CHINS in October 2017 and A.D. was adjudicated as such in June 2018.

[5] Dispositional orders regarding De.D. and M.S. were issued in December 2017 and the dispositional order regarding A.D. was issued in June 2018.

believed Mother improved her parenting skills but not enough to move to unsupervised visits.

[8] During this time, Mother went to rehab twice. Mother first went to Volunteers of America for twenty-eight days where she completed the first phase but did not want to complete the second phase of the program. Mother was sober for several months but then relapsed. It was also recommended that Mother attend Meridian Health Services' Maternal Treatment Program, a six month to one-year program for mothers struggling with substance abuse, and individual therapy. Mandalyn Castanon conducted Mother's initial assessment during which Mother admitted she struggled with heroin abuse, as well as other substances in the past. Castanon testified that Mother suffers from opioid, amphetamine, cocaine, and cannabis use disorders, major depressive disorder, moderate and post-traumatic stress disorder, and bipolar disorder; Mother also has a history of suicide attempts.

[9] Mother began individual therapy but did not attend the Maternal Treatment Program group sessions. She did well in the beginning but after several therapy sessions, Mother relapsed and went to rehab at Meridian's Addictions Recovery Center ("Arc") in Richmond, for twenty-eight to thirty-days of substance abuse treatment. Mother completed the treatment and was referred to individual outpatient treatment ("IOT") at Meridian. In December 2018, Mother attended orientation, six of eight IOT sessions, and two individual therapy sessions. Mother then relapsed by using methamphetamine and heroin. Meridian continued to reach out to Mother through January 2019 but was unable to get

in touch with her and Mother never returned to individual therapy. In February, Meridian closed out services for Mother. At some point, Mother also sought treatment at Vivitrol Program two or three times and went to Wayside Mission, a shelter with NA/AA meetings, for a few months.

[10] On November 16, 2018, De.D. and M.S. were placed with their maternal great-grandmother. From December 2018 to June 2019, Takeya Davis of A Work in Progress supervised Mother's visitations and conducted home-based counseling where they focused on obtaining appropriate shelter and employment for Mother. Although Mother was consistent with home-based counseling, she did not obtain stable housing or maintain employment. Mother had three or four jobs but was unable to keep them. Mother submitted multiple applications for housing and at times, she would stay on the streets or in someone else's vehicle. Davis suggested that Mother live at a shelter; however, Mother refused because she "didn't like the curfew of the shelter [and] would prefer just to be on the streets or stay over [at] different people's homes[.]" Tr., Vol. 2 at 87. With respect to substance abuse, Mother had a three-week period of sobriety during this time. Davis believed Mother's main barrier to obtaining housing and employment was "simply not being able to maintain sobriety" and opined that Mother was under the influence during visitation seventy-five percent of the time. *Id.* at 71, 84. At some point, Davis signed Mother up for rehab, but Mother did not attend. Davis never recommended that Mother move to unsupervised parenting time. Ultimately, Davis stopped working with Mother because A Work for Progress lost its contract with DCS.

[11] Mother began working with DCS FCM Charlene Lynn in March 2018 and generally maintained contact with Lynn. Mother submitted to weekly drug screens "on occasion." *Id.* at 191. Mother should have submitted to 125 drug screens. Instead, she submitted to fifty-seven drug screens, thirty-five of which were positive for "some sort of illicit substance." *Id.*

[12] On May 17 and July 15, 2019, the juvenile court issued orders changing Children's permanency plan from reunification to adoption. The juvenile court found that Mother failed to comply with the case plan, consistently participate in services, or submit to drug screens; Mother also continued to use drugs. On August 9, DCS filed its verified petitions for the involuntary termination of Mother's parental rights to Children. *See* Appellant's Appendix, Volume II at 33-42. A court appointed special advocate ("CASA") was assigned to the case.

[13] In September 2019, Sean McRoberts of Lifeline Youth and Family Services received a referral to supervise Mother's visitation. At the September 26 and October 9 visits, Mother was prepared; she provided snacks for the Children and interacted well. However, Mother failed to attend a scheduled visit on October 3. McRoberts tried to contact her but received no response. The next day, the two spoke and Mother stated she was experiencing withdrawal symptoms.

[14] On October 10, Mother checked into the Harriett House in Fort Wayne, a six-to nine-month addiction treatment facility for women with children. Residents of the program are required to participate in a minimum of fifteen groups per

week, which focus on addiction, anger management, parenting, self-esteem, and life management skills. Upon arrival, Mother submitted to a drug screen and tested positive for amphetamines, methamphetamine, and THC. Mother admitted she used drugs the day before. Mother's drug screen on October 13 was negative but her drug screen on October 14 was positive for THC. Since attending, Mother has done well and is working on earning her GED and obtaining employment. She attends fifteen groups each week at Harriett House, therapy, and seven NA/AA meetings outside the facility. She has been compliant, cooperative, and made improvements. Since beginning treatment, she has had three supervised visits with the Children and her level of engagement has improved.

[15] A fact-finding hearing was held on December 10 and 17, 2019. On April 22, 2020, the juvenile court issued its orders[6] terminating Mother's parental rights to Children and found, in pertinent part:

> 93. [M]other is still in the early stages of the [Harriett House] program, is unable to look for employment, and does not have a plan for stable housing outside of the facility.
>
> 94. There is no plan at this time as to where [M]other will live or how she will support herself after the treatment ends.

---

[6] The juvenile court issued separate termination orders regarding each child. The findings of fact and conclusions of law are substantially the same. Therefore, we quote from only one order.

95.   At the time of the termination fact finding, Mother appears to be doing well in the treatment program and appears to be clean from substances[.]  However,  [M]other has only been in this latest program for two (2) months[.]

96.   According to [M]other's pattern of sobriety, she is able to maintain sobriety only during a treatment program but for no more than two (2) or three (3) months after treatment.

97.   Mother is still within the time frame of a treatment program and it is simply too early to guarantee if this treatment will be long lasting for [M]other or simply part of her two (2) to three (3) month pattern of sobriety after completing treatment.

98.   Simply put, from the Court's perspective, the crux of this case is Mother's substance use disorder.  There is no question that she is a terrific mother when she is sober.  She parents appropriately, is affectionate, and can provide for them.  However, Mother has not been able to, despite all of the services offered by DCS, remain sober.  The Court finds that DCS provided all of the services possible to help [M]other.  And now, at the time of the hearing, Mother is yet again attempting treatment.  The Court lauds [M]other's efforts and her tenacity.  However, . . . the [C]hildren should not be subjected to Mother's continued inconsistency and . . . it is not in their best interests to have to continue to wait and see whether Mother can sustain her treatment goals.

* * *

114.   DCS has made treatment facilities available to [M]other or encouraged [her] to engage in treatment throughout the CHIN[S] case by making at least nine (9) referrals for treatment to facilities such as the VOA, Arc of Richmond, Maternal Treatment Program, IOP, Vivitrol Program, Wayside Mission and the

Harriett House.  Sometimes, multiple referrals were made for the same treatment program before [M]other engaged.

* * *

116.    Mother established a pattern of using drugs, wanting to go to rehab, becoming sober for two (2) to three (3) months, and then relapsing.

117.    The longest period of sobriety for [M]other has been three months.

* * *

128.    [W]hile [M]other is making yet another serious attempt at treatment, the [C]hildren have been removed for such a long period of time that termination is in their best interests.  The Court sympathizes with [M]other and her struggle with addiction, however, the [C]hildren should not be in a position of tortured waiting for her to succeed.

* * *

174.    The Court finds [M]other's latest attempt at treatment to be a last ditch effort to delay permanency for [the Children] and allowing her to do so only delays permanency for [the Children] and is not a substitute for [her] lack of engagement in services or lack of sobriety throughout 2 ½ years of the CHINS case.

Appealed Order [for M.S.] at 8-10, 14.  Based on these findings, the juvenile court concluded there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside of the home will not

be remedied and that the continuation of the parent child relationship poses a threat to the Children's well-being. The juvenile court also concluded termination is in the best interests of the Children. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

We begin by emphasizing that the right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* The law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture[,]" we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[17]     When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[18]     The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

# II. Termination of Mother's Parental Rights

## A. Statutory Framework

[19]  To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). If a

juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## B. Remedy of Conditions

[20] We begin by noting that Mother does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Mother challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal and continued placement outside of her care will not be remedied because she completed a few treatment programs and has been sober for two months. *See* Appellant's Brief at 23. We disagree and conclude the evidence supports the juvenile court's conclusion.

[21] In determining whether such conditions will be remedied, we engage in a two-step analysis: "First, we must ascertain what conditions led to [Children's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, a juvenile court assesses whether a reasonable probability exists that the conditions justifying a child's removal or continued placement outside his parent's care will not be remedied by judging the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). The juvenile court must also balance a parent's recent

improvements against habitual patterns of conduct to determine the likelihood of future neglect. *Id.* Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.,* 903 N.E.2d at 154.

[22] Here, Children were initially removed from Mother and remained outside of her care due to Mother's substance abuse, lack of housing, and inability to provide for Children.

[23] Since DCS became involved in this case two and a half years ago, Mother has never been able to maintain sobriety for more than two or three months at a time. Instead, the overwhelming evidence reveals that, during this time, Mother went to seven different treatment programs, only some of which she completed, and has demonstrated a consistent pattern of going to treatment, maintaining sobriety for a short period of time, relapsing, and then returning to rehab.

[24] At the fact-finding hearing, Green, who supervised Mother's visits from April 2017 to December 2018, testified to this pattern, stating that Mother would do

well and then "slowly decrease[.]" Tr., Vol. 2 at 92. Green explained that the pattern presents safety concerns if Children were to be returned to Mother and ultimately, never recommended that Mother move to unsupervised visitation. FCM Lynn was assigned to this case in March 2018 and echoed Green's testimony about Mother's concerning pattern. At the fact-finding hearing, she testified that Mother "would go through the treatment, she would become sober, and . . . you knew she was sober. She was happier, she was more confident. [A]nd then she would relapse again." *Id.* at 188. Even Mother acknowledged this. She testified, "I would go to treatment, stay sober, then relapse. And it kinda was a pattern but . . . now I'm sixty-three days clean[.]" *Id.* at 237.

[25] Davis, who worked with Mother for six or seven months, testified that she believed Mother was under the influence in seventy-five percent of the visits she supervised. She stated, "[W]hen . . . sober, [Mother is an] excellent mother [and a]lways a hundred percent engaged" but when Mother is not sober, there is "no way . . . she could parent." *Id.* at 74, 76. She also testified that DCS offered Mother "every possible support that they had . . . from rehab to counseling to classes. Like, everything possible was offered . . . nothing that anyone else could offer. It's just within [Mother], like that, that click has to happen for her." *Id.* at 80. For example, before March 2018, FCM Lynn opined that "there were probably nine different referrals [for Mother] at one time or another for inpatient and outpatient" substance abuse treatment. *Id.* at 187.

[26]     Despite services offered by DCS and numerous treatment programs, Mother failed to maintain sobriety for more than a few months at a time. And although Mother had several jobs, she was unable to maintain employment or secure stable and appropriate housing. At the time of the fact-finding hearing in December 2019, Mother's last positive drug screen was in October 2019, she was in treatment at Harriett House, and had been sober for approximately two months. There is no question Mother loves the Children and is capable of parenting when she is sober. But unfortunately, Mother's recent progress is consistent with her historical pattern of seeking treatment, maintaining a few months of sobriety, and then relapsing.

[27]     The juvenile court found Mother's "latest attempt at treatment to be a last ditch effort to delay permanency for [the Children] and allowing her to do so only delays permanency for [the Children] and is not a substitute for [M]other's lack of engagement in services or lack of sobriety throughout 2 ½ years of the CHINS case." Appealed Order [for M.S.] at 14. Here, the juvenile court weighed Mother's historical pattern of conduct more heavily than her recent progress, a task solely within its discretion. *See In re K.T.K.,* 989 N.E.2d at 1234. We conclude there is ample evidence in the record to support the

juvenile court's conclusion there is a reasonable probability that Mother's substance abuse and inability to provide for the Children will not be remedied.[7]

## B. Best Interests

[28] Mother also claims DCS failed to prove that termination of her parental rights is in the Children's best interests. *See* Appellant's Br. at 24. However, Mother fails to support this assertion with any argument, and it is therefore waived. *See* Ind. Appellate Rule 46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning."). Nonetheless, we briefly address this issue.

[29] "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). To determine the best interests of children, the juvenile court looks to the totality of the evidence and must subordinate the interests of the parents to those of the children. *In re D.D.*, 804 N.E.2d at 267. The juvenile court need not wait until a child is irreversibly harmed before terminating parental rights. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). Recommendations of the FCM and CASA, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by

---

[7] Mother also contends the juvenile court erred in finding that the continuation of the parent-child relationship poses a threat to the well-being of Children. Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in Children's removal and continued placement outside of Mother's care will not be remedied, we need not consider whether the parent-child relationship poses a threat to Children's well-being. *See In re L.S.*, 717 N.E.2d at 209.

clear and convincing evidence that termination is in the child's best interest. *In re A.S.*, 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[30] Here, CASA Lynne Cooper and FCM Charlene Lynn both testified at the fact-finding hearing that termination of Mother's parental rights was in Children's best interests. *See* Tr., Vol. 2 at 170-71, 198-99. Lynn testified that despite Mother's recent improvement, DCS' position regarding the Children has not changed because Mother still lacks housing and income, and she needs to continue to stay in treatment. She explained, "[A]t this point the only certainty that I see is she has to . . . take care of herself before she can take care of her children or she's not ever going to be successful." *Id.* at 197. Similarly, Cooper stated, "[Mother] is doing super well. I really am optimistic and hopeful for her. But these girls need permanency and we're looking at six months out again and with an uncertain future and the girls don't need an uncertain future. They need a future that they can count on." *Id.* at 170. Based on the length of time the Children have been outside of Mother's care, Cooper believed termination of Mother's rights and adoption is in the Children's best interests. *See id.* at 170-71. Having already concluded there is evidence that the conditions resulting in Children's removal will not be remedied, this testimony is sufficient evidence to support the juvenile court's conclusion that termination of Mother's parental rights is in Children's best interests. *See In re A.S.*, 17 N.E.3d at 1005.

# Conclusion

We conclude DCS presented sufficient evidence to support the juvenile court's order terminating Mother's parental rights to Children. Therefore, the termination order was not clearly erroneous, and the judgment of the juvenile court is affirmed.

Affirmed.

Crone, J., and Brown, J., concur.